**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 29, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

DAVID A. ECKHART,

    Defendant - Appellant.

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JUAN PEREZ CARDENAS,

    Defendant - Appellant

No. 07-4126

No. 07-4022

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:05-CR-00529-DAK-1-2)**

Submitted on the briefs:

Brett Tolman, United States Attorney, and Diana Hagen, Assistant United States Attorney, Office of the United States Attorney for the District of Utah, Salt Lake City, Utah, for Plaintiff - Appellee.

Steven B. Killpack, Utah Federal Defender, and Scott Keith Wilson, Assistant Federal Defender, Utah Federal Defender's Office, Salt Lake City, Utah, for

Defendant - Appellant Eckhart.

Mary C. Corporon of Corporon & Williams, Salt Lake City, Utah, for Defendant - Appellant Cardenas.

---

Before **O'BRIEN, TYMKOVICH** and **HOLMES**, Circuit Judges.

---

**O'Brien**, Circuit Judge.

---

Juan M. Perez Cardenas and David A. Eckhart were stopped because the license plate on their truck was not visible to a police officer traveling in the adjoining lane. After twenty-seven minutes of questioning, they consented to a search of their vehicle, which revealed 1,027 grams of cocaine and 213 grams of methamphetamine. Charged with possession of a controlled substance with intent to distribute, they filed motions to suppress, which were denied. Their cases were then severed and each pled guilty, reserving the right to appeal from the denial of the motion to suppress. The court denied their requests for minor participant status and sentenced each defendant to 87 months imprisonment, the low end of the advisory guideline range. In separate appeals, Cardenas (07-4022) and Eckhart (07-4126) now challenge the denial of their motions to suppress and the denial of minor participant status. Because the factual and legal arguments underlying these two appeals are the same, we have consolidated them for

-2-

administrative purposes. Their arguments fail; we affirm.

## I. BACKGROUND

A.    <u>Factual History</u>

At 10:30 p.m. on Friday, June 17, 2005, Utah Highway Patrol Trooper Donald Robert Gould, a nine-year police veteran with specialized training in drug pipeline interdiction, was driving eastbound on a remote section of Interstate 80 in Tooele County, Utah, when he was passed by a small pickup truck traveling in the left lane. The truck had a California license plate, but Gould was unable to read the plate number. He ran the number two different ways, but it came up as "not on file" both times.[1] Gould pulled the truck over, as he believed Utah law required license plates to be visible from a distance of one hundred feet.

After the stop, Gould illuminated the rear plate with his spotlight and was finally able to read the number. He contacted dispatch with the number and then approached the truck. As he did so, he noticed there were after-market metal plates bolted on the back bumper. He also noticed the light designed to illuminate the license plate was not working. In his opinion, the lack of a functioning plate light impeded his ability to read the plate and a trailer hitch may also have obscured his view.

Gould asked the driver, Eckhart, for his license and registration. Eckhart

---

[1] Specifically, Gould could not read the second digit of the license plate number. He thought it might be a "6" or a "G" but it turned out to be a "C."

-3-

produced a Pennsylvania license but did not produce the truck's registration, instead motioning to indicate the truck belonged to the passenger, Cardenas. Eckhart was "visibly shaking" when he handed Gould his license and did not make eye contact with Gould. (R. Vol. II (Eckhart), Supp. Vol. I (Cardenas) at 14.) Gould believed Eckhart's nervousness could indicate possible criminal activity. He asked Cardenas if it was his truck and Cardenas stated the truck belonged to his uncle. He also asked Cardenas for his driver's license but Cardenas was only able to produce a Washington identification card.

Gould asked Eckhart why he and Cardenas had the truck. Eckhart stated he was going back to Pennsylvania and Cardenas was going along for a vacation. Gould observed only a small backpack in the truck, which he believed was inconsistent with Eckhart's story of a cross-country trip. Gould suspected the truck might be stolen because neither Eckhart nor Cardenas could provide documentation for the vehicle. He decided to separate Eckhart and Cardenas and ask about the truck and their travel plans.

He first spoke to Eckhart, who answered as follows. Eckhart knew Cardenas because he had a friend, Jorge, in Pennsylvania, who was related to Cardenas. He and Cardenas were planning to visit Cardenas' uncle in Pennsylvania. Despite their supposed friendship, Eckhart did not know Cardenas' last name but knew him only as "Juan." Eckhart had just been laid-off but had worked in landscaping and construction. He had flown from Pennsylvania to Los

Angeles, where he was picked up by Cardenas and his uncle. The three men drove to Fresno, where Eckhart vacationed for about a week. Eckhart asked Cardenas' uncle for permission to borrow the truck to drive back to Pennsylvania. The uncle said he could but only if Cardenas accompanied him on the trip. Eckhart and Cardenas left California that morning and had been taking turns driving all day. As Gould and Eckhart were standing behind the truck, Eckhart acknowledged the license plate was difficult to read.

While questioning Eckhart, Gould received a phone call from dispatch advising the truck had not been reported stolen. This did not alleviate Gould's suspicion, however, because stolen vehicles are not always listed in the national database. Based on his training and experience, Gould also suspected Eckhart and Cardenas might be transporting illegal narcotics.

Gould then questioned Cardenas. Cardenas' story was consistent with Eckhart's in many respects, though Cardenas stated he had not accompanied his uncle to the airport in Los Angeles to pick up Eckhart. He said the truck had been purchased by his uncle about four days ago. He said Eckhart was traveling to Pennsylvania to visit his father and he (Cardenas) was going along for the ride. He did not intend to visit his relative in Pennsylvania because he had to be back in Fresno on Monday (three days later) for work. When Gould asked how Cardenas was planning to get back, Cardenas stated he would either drive the truck or take a bus, which Gould found to be implausible because of the short

time-frame.[2]

Gould and Cardenas returned to the truck. Cardenas still could not locate a registration. Gould requested a phone number for Cardenas' uncle so he could confirm his ownership of the truck. Cardenas provided a phone number with a Fresno area code and stated his Fresno uncle's name was "Jose." (Eckhart later said the uncle's name was "Pedro.") Gould's dispatcher called the phone number and spoke with someone who said the truck had been sold. Obviously, this call did not confirm rightful possession of the truck.[3]

Trooper Croft arrived at the scene. Gould explained what had happened and Croft agreed criminal activity was likely. Continued questioning revealed Eckhart had been driving the whole time because Cardenas did not have a driver's license. After more questioning (and the arrival of at least one or two more officers), Gould asked Eckhart whether there was any contraband in the truck such as large amounts of cash or illegal drugs. Eckhart answered "no." Gould then asked Eckhart for permission to search the truck. Eckhart said, "I don't care." (*Id.* at 31.) Gould asked him again and he said, "sure." (*Id.*) Gould asked Cardenas if there was anything in the truck he needed to know about. Cardenas

---

[2] In addition, Cardenas did not have a driver's license and thus, could not have legally driven the truck back.

[3] The police later determined title to the truck had been transferred from Davida or Roy Peden to Gustavo Martinez (neither "Jose" nor "Pedro") on April 23, 2005, almost one month (not four days) prior to the stop.

said he was not aware of anything. Gould then asked Cardenas if it was okay to search the truck and he said, "go ahead." (*Id.* at 33.)

The officers removed the items in the truck bed and began searching, looking in particular for a hidden compartment. Gould called for a drug dog, who arrived at the scene with his handler approximately twenty minutes later. The dog alerted to the shifter boot and the passenger side air vent. Nothing was found in either location. Gould then searched the items removed from the truck bed. He looked closely at a small red cooler which appeared to have been modified. Gould separated the lining of the cooler from the body and discovered three packages where the insulation should have been. The packages contained a substance which tested positive in the field for methamphetamine. The packages were later determined to contain 1,027 grams of cocaine and 213 grams of methamphetamine.

B.    Procedural History

On July 21, 2005, Eckhart and Cardenas were charged with possession of methamphetamine with intent to distribute.[4] Cardenas moved to suppress the statements made during the stop and the evidence discovered during the search. A magistrate judge held an evidentiary hearing at which Gould testified. The magistrate concluded: (1) the traffic stop was justified at its inception; (2) the

---

[4] In a supplemental indictment, Eckhart was also charged with possession of cocaine. The government later agreed to drop this charge in exchange for Eckhart's guilty plea to the methamphetamine charge.

stop was not unreasonably broad in scope; (3) Cardenas had standing to contest the search but validly consented to it; and (4) the stop was not tainted by the officers' failure to advise Cardenas of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). The district judge adopted the report and recommendation with one exception; he concluded Cardenas did not have standing to challenge the search and therefore did not consider whether the consent was valid.

After the court ruled on Cardenas' motion, Eckhart filed a motion to suppress raising the same arguments made by Cardenas. The court ruled Cardenas' motion would apply to Eckhart and denied the motion, thus preserving Eckhart's right of appeal.

Cardenas and Eckhart both pled guilty to one count of possession of methamphetamine with intent to distribute while reserving the right to appeal the denial of the motion to suppress. A presentence investigation report (PSR) was prepared on each individual. Both PSRs determined the applicable sentencing guideline range was 87-108 months imprisonment, assuming Cardenas and Eckhart received safety valve relief under USSG §5C1.2(a), 18 U.S.C. § 3553(f).

Both Cardenas and Eckhart requested a two-level downward adjustment under USSG §3B1.2, each claiming they played only a minor role in the offense. Cardenas claimed he had agreed to help Eckhart transport the drugs in order to pay off an outstanding drug debt. He claimed he had never met Eckhart prior to the trip. In response to Cardenas' request, the probation officer stated:

"Investigative materials do not indicate that [Cardenas'] knowledge and conduct were less than that of [Eckhart]. Both men appear to be equally responsible for transporting the drugs. [Cardenas] reported he agreed to help with the driving to pay off a personal drug debt." (R. Vol. III (Cardenas) at addendum.) At sentencing, Cardenas claimed he was merely "a mule." The court sentenced Cardenas to 87 months imprisonment, concluding a safety-valve reduction was warranted, but a reduction under §3B1.2 was not because "[t]here is nothing in the record that convinces me . . . [Cardenas] is eligible for minimal or minor participant [status]." (R. Vol. II (Cardenas) at 3.)

Eckhart argued he was entitled to a §3B1.2 reduction because he had no knowledge of the amount or purity of the drugs; he was not a drug dealer, purchaser or a courier prior to this offense; he did not know the source or exact destination of the drugs; he received no compensation for his involvement; and he was less culpable than Cardenas.[5] At Eckhart's sentencing hearing, the government argued a reduction for minor participant status was not justified.

_____

[5] Eckhart claimed he had contacted Jorge, a drug dealer in Pennsylvania, and asked if he could stay with his brother, Pedro, while visiting California. One of Jorge's friends took Eckhart to the airport. There he purchased a one-way ticket for $311 in cash with his own money. That left him with $389 for traveling expenses. Pedro and Cardenas picked Eckhart up at the airport and drove to a hotel, where they spent the night. When they arrived at Pedro's house the next day, Pedro's wife would not allow Eckhart to stay. Pedro paid for Eckhart to stay at a hotel for another night and gave him drugs for his use. The next morning, Pedro asked Eckhart if he would drive to Pennsylvania with Cardenas so Cardenas could visit his uncle. Eckhart agreed and, prior to leaving, was informed by Cardenas they would be transporting drugs to Pennsylvania.

Even taking Eckhart's facts as true, he knew they were transporting drugs and he was the primary, if not sole, driver. He was not a minor participant. The court sentenced Eckhart to 87 months imprisonment, explaining: "I guess I don't believe that under the law even if the facts are as represented by defendant it still looked to me like a minimum . . . or minor participant will not apply." (R. Vol. III (Eckhart) at 14.)

## II. DISCUSSION

A. <u>Denial of Motion to Suppress</u>

Cardenas and Eckhart contend the district court erred in denying their motions to suppress because: (1) the initial stop was not justified at its inception; (2) the police exceeded the scope of the stop; and (3) they have standing to contest the search, which was not conducted pursuant to valid consent. Cardenas also contends the roadside statements he made should have been suppressed on account of the officers' failure to give a *Miranda* advisement. "When reviewing the denial of a motion to suppress, we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless clearly erroneous, and review *de novo* the ultimate determination of reasonableness under the Fourth Amendment." *United States v. Katoa*, 379 F.3d 1203, 1205 (10th Cir. 2004).

1. *Initial Stop*

Cardenas and Eckhart contend the traffic stop was not justified at its

inception because it was based on a mistake of law. *See United States v. DeGasso*, 369 F.3d 1139, 1144 (10th Cir. 2004) ("An officer's reasonable mistake of fact, as distinguished from a mistake of law, may support the probable cause or reasonable suspicion necessary to justify a traffic stop."). In addition, they contend the stop was not justified because Utah police officers may not enforce Utah license plate statutes on cars licensed in California.[6] They claim "[s]topping an out-of-state vehicle impedes the occupants' right to interstate travel, as protected by the Privileges and Immunities Clause and the Equal Protection Clause."[7] (Cardenas' Opening Br. at 11.)

---

[6] They also argue the stop was not justified at its inception because "Gould should have known . . . that stopping a vehicle based on an officer's misinterpretation of a foreign state's law is an illegal stop." (Cardenas' Opening Br. at 13). Gould never claimed he pulled the truck over for a violation of California law; rather, he believed the truck was in violation of Utah law. Not only is the case relied upon by Cardenas and Eckhart, *Utah v. Friesen*, not controlling on the interpretation of the Fourth Amendment, it is inapposite. 988 P.2d 7 (Utah Ct. App. 1999). In *Friesen*, the defendant was driving a vehicle with a Wyoming license plate affixed to the rear and was stopped by a state trooper in Utah who believed Wyoming law required the display of front and rear license plates. The court held: "Although the people of Utah have an interest in requiring individuals traveling our highways to comply with the law, including the law regarding the display of license plates, this interest does not justify arbitrarily stopping out-of-state vehicles on the chance that there has been a violation of another state's law." *Id.* at 10-11. That reasoning does not apply here as Gould stopped the truck for a violation of Utah law, not California law. Moreover, California, like Utah, requires license plates to be clearly visible. *See* Cal. Veh. Code § 5201 ("License plates shall at all times be . . . mounted in a position so as to be clearly visible, and shall be maintained in a condition so as to be clearly legible.") Thus, if Gould had pulled Cardenas and Eckhart over based on his understanding that California law requires license plates to be clearly visible, he would not have been mistaken.

[7] While Cardenas and Eckhart rely on the Privileges and Immunities Clause in Article I, the Supreme Court has considered the federal right of interstate travel

### a. Mistake of Law

The government asserts the stop was justified at its inception because the license plate was not clearly visible and legible, as required by Utah law. *See* Utah Code Ann. § 41-1a-404(3) ("Every license plate shall at all times be: (a) securely fastened: . . . (iii) in a place and position to be clearly visible; and (b) maintained: . . . (ii) in a condition to be clearly legible.").

"[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc). "Our sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated 'any one of the multitude of applicable traffic and equipment regulations' of the jurisdiction." *Id.* (*quoting Delaware v. Prouse*, 440 U.S. 648, 661 (1979)). In *Botero-Ospina*, we upheld the denial of a defendant's motion to suppress where "[the deputy] observed a violation of [Utah law] relating to lane straddling" and "he was able to articulate specific facts which, in light of his training and experience, gave rise to a reasonable suspicion that [the defendant] may have been driving under the influence of alcohol, in violation of [Utah law]." *Id.* at 788. We explained "either or both of these reasons" provided

_____

to arise from the Commerce Clause, not the Privileges and Immunities Clause. *See United States v. Guest*, 383 U.S. 745, 758 (1987).

-12-

justification for the initial stop. *Id.*

Gould stopped this truck because he "could see the plate, but [ ] could not read all the digits on it." (R. Vol. II at 11 (Eckhart), Supp. Vol. I (Cardenas) at 11.) After he stopped the truck and with the aid of a spotlight, he could read all the digits. As he walked toward the truck, he observed the license plate light was not properly working.[8] Like the officer in *Botero-Ospina*, Gould observed a violation of Utah law before he made the stop. However, Gould was incorrect about which provision of law had in fact been violated. He believed Utah law required license plates to be visible up to 100 feet at any time. He was mistaken – the 100-foot limitation is only applicable in daylight. *See* Utah Code Ann. § 41-1a-403 ("License plates and the required letters and numerals on them . . . shall be of sufficient size to be plainly readable from a distance of 100 feet during daylight."). However, he was not mistaken that what he observed – a license plate not clearly visible or legible – violated Utah law. *See* Utah Code Ann. §§ 41-1a-404(3)(b)(ii). At the time of the stop, Gould knew the plate was not clearly legible, even though he did not know precisely why not.[9]

---

[8] Utah law requires "[e]ither a tail lamp or a separate lamp shall be so constructed and placed as to illuminate with a white light the rear registration plate." Utah Code Ann. § 41-6a-1604(2)(c). While Gould was not aware of this violation until after he pulled the truck over, it likely explains why the license plate was not legible.

[9] In his reply brief, Eckhart argues the observations made by Gould after he pulled over the vehicle "cannot be considered as facts in support of the [district] court's conclusion that [Gould] had grounds to initiate the stop in the first place."

In *DeGasso*, an officer stopped a vehicle based on his mistaken belief that the driver's use of fog lamps violated Oklahoma law.[10]  369 F.3d at 1141-42. Unlike Gould, the officer in *DeGasso* was not simply mistaken about which particular statute was violated.  Rather, the conduct he observed – driving with fog lamps illuminated during daylight hours when visibility was clear – did not violate "any of the multitude of applicable traffic and equipment regulations of the jurisdiction."  *Botero-Ospina*, 71 F.3d at 787 (quotations omitted). Notwithstanding the officer's mistake of law, the district court held the stop was justified because the officer reasonably believed the fog lamp statute had been violated.  We stated the court's reasoning "misses the mark."  *DeGasso*, 369 F.3d at 1144.  It is "irrelevant" whether the officer acted in good faith; instead, "the dispositive inquiry is whether Oklahoma traffic law regarding the use of fog

---

(Eckhart's Reply Br. at 2.)  We disagree.  Gould was traveling in the lane next to Cardenas and Eckhart and could not read the back plate on their truck – it was not clearly visible and legible, in violation of Utah law.  Eckhart also argues Gould did not observe a violation because Utah law requires only that the license plate be "fastened . . . in a place and position" and "maintained . . . in a condition" to be clearly visible and legible.  (*Id.* (quotations omitted).)  If the license plate was not illuminated as required by Utah law, *see supra* note 8, it was obviously not "maintained . . . in a condition to be clearly legible."  Utah Code Ann. § 41-1a-404(3)(b)(ii).

[10] The statute in effect on the date of the stop provided: "Fog lamps shall not be used in substitution of headlamps, except under conditions of rain or fog rendering disadvantageous the use of headlamps."  Okla. Stat. tit. 47 § 12-217.D, amended by 2003 Okla. Sess. Laws ch. 411, § 34 (effective Nov. 1, 2003).  The defendant was driving "during daylight hours when visibility was clear." *DeGasso*, 369 F.3d at 1144.  Thus, the use of fog lamps was not illegal.

-14-

lamps provided [the trooper] with an *objectively justifiable basis* for stopping Defendants." *Id.* We concluded it did not because there was 1) no mistake of fact or 2) violation of Oklahoma law.

An officer need not be able to quote statutes (or scripture), chapter and verse. Some confusion about the details of the law may be excused so long as there was either "an observed [actual] traffic violation or [] reasonable articulable suspicion that [an actual] traffic or equipment violation has occurred or is occurring." *Botero-Ospina*, 71 F.3d at 787.

Here, the district court did not err in concluding the initial stop was justified based on the illegibility of the vehicle's license plate, which was an actual violation of Utah's equipment laws. That Gould was wrong about the particulars of the law is not fatal. *See United States v. Wallace*, 213 F.3d 1216, 1220 (9th Cir. 2000) (initial stop justified where "[the officer]'s observations correctly caused him to believe that [the defendant]'s window tinting was illegal" though he was "wrong about exactly why" because "[t]he issue was not how well [the officer] understood California's window tinting laws, but whether he had objective, probable cause to believe that these windows were, in fact, in violation").

b. Right to Travel

Cardenas and Eckhart's constitutional argument is equally unavailing because enforcement of Utah's license plate statutes on out-of-state drivers does

not violate the Commerce Clause. Freedom to travel is indeed a basic Constitutional right. *See United States v. Guest*, 383 U.S. 745, 758 (1966). "The federal guarantee of interstate travel . . . protects interstate travelers against two sets of burdens: 'the erection of actual barriers to interstate movement' and 'being treated differently' from intrastate travelers." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 276-77 (1993) (*quoting Zobel v. Williams*, 457 U.S. 55, 60 n.6 (1982)). Neither set of burdens is implicated here. Utah does not treat intra- and interstate travelers differently. Moreover, Utah's requirement that license plates be clearly visible and legible does not place a barrier on interstate movement as it is not unique to Utah and does not contradict the laws of other states. *See United States v. Martinez*, 512 F.3d 1268, 1273 n.2 (10th Cir.) (stop of defendants' vehicle did not violate their right to interstate travel where officer in Utah stopped vehicle registered in California for not displaying a front license plate because "under both Utah and California traffic laws, a vehicle must display a front license plate"), *cert. denied*, 128 S. Ct. 2461 (2008); *see also DeGasso*, 369 F.3d at 1148 ("[W]hile every state has some statute prohibiting the obstruction of license plates, none has interpreted its statutory scheme to allow out-of-state cars to be driven with obscured license plates."); *see, e.g.*, Cal. Veh. Code § 5201 (requiring license plates to be "clearly visible" and "clearly legible"). Cardenas and Eckhart's reliance on *Bibb v. Navajo Freight Lines, Inc.* is misplaced as the appellees in *Bibb* made a "rather massive showing of burden

on interstate commerce."  359 U.S. 520, 528 (1959).  Cardenas and Eckhart have made no such showing.

2.  *Scope of the Stop*

Cardenas and Eckhart argue even if the initial stop was valid, the scope of the stop was not reasonably related to the circumstances which justified the interference in the first place, a requirement under the Fourth Amendment.  *See Botero-Ospina*, 71 F.3d at 786 (to be reasonable, a traffic stop must not only be "justified at its inception," the temporary detention associated with the stop must be "reasonably related in scope to the circumstances which justified the interference in the first place").  Relying on *United States v. McSwain*, 29 F.3d 558 (10th Cir. 1994), and *United States v. Edgerton*, 438 F.3d 1043 (10th Cir. 2006), they claim the reasonable suspicion for the stop evaporated as soon as Gould was able to read their license plate number, and at that point, they should have been allowed to go on their way.

*McSwain* and *Edgerton* do not support Cardenas and Eckhart's position.  In *McSwain*, a state trooper stopped the defendant's vehicle "for the sole purpose of ensuring the validity of the vehicle's temporary registration sticker."  29 F.3d at 561.  As the trooper approached the vehicle on foot, he verified the tag was valid and had not expired.  *Id.*  We held the trooper's decision to prolong the detention by requesting the defendant's license and registration "exceeded the scope of the stop's underlying justification" and therefore violated the Fourth Amendment.  *Id.*

In *Edgerton*, a state trooper stopped the defendant's vehicle because he could not read the temporary registration tag. 438 F.3d at 1044. We held "[o]nce [the trooper] was able to read the Colorado tag and deem it unremarkable, any suspicion that defendant had violated [the Kansas statute relating to the display of license plates] dissipated . . . [and] [the trooper], as a matter of courtesy, should have explained to Defendant the reason for the initial stop and then allowed her to continue on her way without requiring her to produce her license and registration." *Id.* at 1051.

The troopers in *McSwain* and *Edgerton* had reasonable suspicion the vehicles they stopped were violating the traffic laws, thus justifying the initial stops, but their suspicion evaporated when they determined no violations had in fact occurred. Here, by contrast, Gould's suspicion did not evaporate but was instead validated by an actual violation – the license plate on the truck was not "clearly visible" and "clearly legible" and was not illuminated as required. *See* Utah Code Ann. §§ 41-1a-404(3)(a)(iii), (b)(ii); 41-6a-1604(2)(c). Thus, Gould's request for Cardenas and Eckhart's licenses and registration and his questioning of them did not violate the Fourth Amendment. *See United States v. Karam*, 496 F.3d 1157, 1161 (10th Cir. 2007) ("During a routine traffic stop, an officer may request a driver's license and vehicle registration, run a computer verification of these documents and issue a citation or warning. An officer can also ask the driver questions about matters both related and unrelated to the purpose of the

stop . . . .") (citation omitted); *see, e.g., United States v. Ledesma*, 447 F.3d 1307, 1314 (10th Cir. 2006) (holding it was reasonable for a trooper "to issue a written warning, verify [the defendant]'s license and registration information, and ask preliminary questions about travel plans" where defendant's registration tag was displayed in an unlawful manner); *DeGasso*, 369 F.3d at 1149 (upholding a trooper's detention of defendant because the trooper observed a continuing violation of state law after stopping defendant's vehicle).

Cardenas and Eckhart do not contend Gould's questioning prolonged the detention beyond the time required for the initial stop.[11] Thus, we need not consider whether Gould had reasonable and articulable suspicion of criminal activity to justify the detention.[12] *See United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1259 (10th Cir. 2006) (no justification necessary where officer's questioning prior to issuing warning ticket does not "appreciably lengthen the detention"). The district court did not err in concluding the twenty-seven minute detention of Cardenas and Eckhart prior to the search was permissible.

3. *Standing to Contest Search*

---

[11] The officers could reasonably detain the vehicle and its occupants until the issue of ownership and right to possession were resolved.

[12] The district court did consider this question and concluded Gould had reasonable suspicion the vehicle might be stolen and Cardenas and Eckhart might be involved in drug trafficking based on the lack of documentation for the vehicle, the vehicle's registration in the name of an unknown third party, Eckhart's nervousness, the presence of metal plates bolted on the back bumper, inconsistent stories and implausible travel plans.

Cardenas and Eckhart contend the district court erred in holding they lack standing to contest the search. "We review a court's determination of standing de novo." *United States v. Allen*, 235 F.3d 482, 489 (10th Cir. 2000).

"Fourth Amendment rights are personal and cannot be claimed vicariously." *United States v. Hocker*, 333 F.3d 1206, 1208 (10th Cir. 2003). "The proponent of a motion to suppress has the burden of adducing facts at the suppression hearing indicating that his own rights were violated by the challenged search." *Allen*, 235 F.3d at 489 (quotations omitted).

> Whether a defendant's own Fourth Amendment rights were violated by a challenged search turns on the classic Fourth Amendment test: whether the defendant manifested a subjective expectation of privacy in the area searched and whether society is prepared to recognize that expectation as objectively reasonable. This court has held that, in order for a defendant to show such an expectation of privacy in an automobile, the defendant bears the burden at the suppression hearing to show a legitimate interest in or [a] lawful control over the car.

*Id.* (quotations and citations omitted).

"[A] defendant need not submit legal documentation showing a chain of lawful custody from the registered owner to himself." *Hocker*, 333 F.3d at 1209. Where, as here, "the proponent of a motion to suppress is . . . not the registered owner . . . the proponent bears the burden of establishing 'that he gained possession from the owner or someone with authority to grant possession.'" *Id.* (*quoting United States v. Arango*, 912 F.2d 441, 445 (10th Cir. 1990)). We consider: "(1) whether the defendant asserted ownership over the items seized

from the vehicle; (2) whether the defendant testified to his expectation of privacy at the suppression hearing; and (3) whether the defendant presented any testimony at the suppression hearing that he had a legitimate possessory interest in the vehicle." *Allen*, 235 F.3d at 489.

While Cardenas and Eckhart did assert ownership over the items seized from the vehicle, they did not meet their burden of establishing a legitimate possessory interest in the vehicle. They did not testify to their expectation of privacy; nor did they present testimony or evidence establishing they gained possession of the truck from someone with authority to grant it. They both claimed the truck had recently been purchased by Cardenas' Fresno uncle, who had given them permission to drive it to Pennsylvania, but they produced no evidence to support this claim and never explained their relationship to the registered owner of the vehicle, Gustavo Martinez (neither "Jose" nor "Pedro").

Our cases are clear. A defendant does not have standing to contest a search where he does not establish a link between himself and the registered owner. *See United States v. Betancur*, 24 F.3d 73, 77 (10th Cir. 1994) (holding the borrower of a car lacks standing where the car registration indicates it is owned by someone other than the alleged lender and the borrower fails to present any evidence of a linkage between the lender and registered owner); *United States v. Martinez*, 983 F.2d 968, 973 (10th Cir. 1992) (holding the driver of a car lacks standing where she claims she borrowed the car from a friend, who in turn borrowed it from a

-21-

third person, who was not shown to be connected in any way with the registered owner); *Arango*, 912 F.2d at 445-46 (denying standing to defendant who borrowed the vehicle from a person whom he knew was not the registered owner and who provided no evidence suggesting the lender was in lawful possession of the vehicle); *United States v. Erwin*, 875 F.2d 268 (10th Cir. 1989) (denying standing to defendant who did not introduce any evidence at his suppression hearing to establish his legitimate possession of the vehicle). The district court correctly concluded Cardenas and Eckhart lack standing to challenge the search. Thus, we need not examine the constitutionality of that search. *See Allen*, 235 F.3d at 490.

4. *Lack of* Miranda *Advisement*

Cardenas contends the roadside statements he made should have been suppressed because the officers failed to advise him of his *Miranda* rights.[13] The government contends no *Miranda* advisement was necessary because the traffic stop did not rise to the level of a custodial interrogation.

"It is well established that police officers are not required to administer *Miranda* warnings to everyone whom they question." *United States v. Hudson*, 210 F.3d 1184, 1190 (10th Cir. 2000) (quotations omitted). "Instead, the protections set out by the Supreme Court in *Miranda* only apply when an

_____

[13] Specifically, Cardenas seeks suppression of "all the statements [he made] about the truck, his travel plans, family, and co-defendant." (Cardenas' Opening Br. at 23.)

individual is subject to custodial interrogation." *United States v. Rogers*, 391

F.3d 1165, 1169 (10th Cir. 2004) (quotations omitted). Generally, "*Miranda*

warnings are . . . not implicated in the context of a valid *Terry* stop." *United*

*States v. Perdue*, 8 F.3d 1455, 1464 (10th Cir. 1993).[14] As we explained in

*Perdue*, "the typical police-citizen encounter envisioned by the Court in *Terry*

usually involves no more than a very brief detention without the aid of weapons

or handcuffs, a few questions relating to identity and the suspicious

circumstances, and an atmosphere that is substantially less police dominated than

that surrounding the kinds of interrogation at issue in *Miranda*." *Id.* (quotations

omitted). In *Perdue*, we recognized a limited exception to this general rule,

holding police officers must advise suspects of their constitutional rights, even in

the context of a *Terry* stop, "if they . . . take highly intrusive steps to protect

themselves from danger." *Id.* at 1465.

The officers here did not take highly intrusive measures against Cardenas.

Cardenas was never handcuffed or placed in a police cruiser and no weapons were

drawn. Moreover, the officers were polite in their demeanor and did not use or

threaten the use of force at any time. This stop was the typical "noncoercive" and

"nonthreatening" *Terry* stop. *See id.* at 1464-65. The force used was not of a

level "more associated with formal arrest," *id.*, and stands in stark contrast to

*Perdue*, where we held a *Miranda* advisement was required after the police forced

---

[14] *Terry v. Ohio*, 392 U.S. 1 (1968).

the suspect off the road and then onto the ground, handcuffed him and questioned him at gunpoint with a helicopter hovering overhead. *Id.* at 1464. None of those extreme factors are present here and a *Miranda* advisement was not necessary prior to arrest.

B. Sentencing

Both Cardenas and Eckhart requested a downward adjustment pursuant to USSG §3B1.2, which allows the sentencing judge to decrease a defendant's offense level by four levels "[i]f the defendant was a minimal participant in any criminal activity," by two levels "[i]f the defendant was a minor participant in any criminal activity," or by three levels for cases falling in between.[15] The district court denied the requested adjustment. "We review the sentencing court's factual decisions for clear error and its legal conclusions *de novo*." *United States v. Salazar-Samaniega*, 361 F.3d 1271, 1275 (10th Cir. 2004). "We do not require a district court to make detailed findings, or explain why a particular adjustment [under the guidelines] is or is not appropriate." *United States v. Bowen*, 437 F.3d 1009, 1019 (10th Cir. 2006) (quotations omitted).

The §3B1.2 adjustments are intended "for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant." USSG §3B1.2, comment. (n.3(A)). The determination

---

[15] All references to the United States Sentencing Guidelines are to the 2006 version.

whether to apply an adjustment under this section "is heavily dependent upon the facts of the particular case. As with any other factual issue, the court, in weighing the totality of the circumstances, is not required to find, based solely on the defendant's bare assertion, that such a role adjustment is warranted." *Id.*, comment. (n.3(C)). "[T]he defendant has the burden of proving his minor or minimal participation." *Salazar-Samaniega*, 361 F.3d at 1277.

Though Cardenas and Eckhart contend they were mere couriers, we have recognized "[d]rug couriers are an indispensable component of drug dealing networks" and have "refused to adopt a per se rule allowing a downward adjustment based solely on a defendant's status as a drug courier." *United States v. Rangel-Arreola*, 991 F.2d 1519, 1524 (10th Cir. 1993). "Instead, a downward adjustment for a defendant's role in an offense turns on the defendant's culpability relative to other participants in the crime." *Id.* Both Cardenas and Eckhart claim they are less culpable than the other. There is no evidence to support that, apart from their self-serving statements, which the district court could well have found not credible. *See Salazar-Samaniega*, 361 F.3d at 1278. "A defendant's own testimony that others were more heavily involved in a criminal scheme may not suffice to prove his minor or minimal participation, even if uncontradicted by other evidence." *Id.* The district court's determination that Eckhart and Cardenas failed to establish their minor or minimal participation was not clearly erroneous.

**AFFIRMED.**