**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

DARYL LEE INGRAM, a/k/a Black, a/k/a
Clacc, a/k/a Ninety Black, a/k/a BJ,

    Defendant - Appellant.

No. 16-6220
(D.C. No. 5:15-CR-00053-M-1)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HARTZ**, **PHILLIPS**, and **MORITZ**, Circuit Judges.
_____

Daryl Lee Ingram filed two appeals challenging separate but related drug

convictions. Here, Ingram contests his conviction for possession with intent to

distribute cocaine base, or crack cocaine, in violation of 21 U.S.C. § 841(a)(1),

(b)(1)(A)(iii). Specifically, he disputes the legality of the traffic stop that led to his

arrest. We conclude that the traffic stop was lawful. Exercising jurisdiction under 28

U.S.C. § 1291, we affirm.

---

    * This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## BACKGROUND

*I.     The traffic stop*

During a multi-agency federal and state investigation into the Rollin' 90's gang in Oklahoma City, Oklahoma, a confidential informant told Detective Jeff Reed of the Oklahoma City Police Department that a man named Anthony Anderson was selling crack cocaine from a white Honda Civic. Before receiving the tip, Detective Reed knew that Anderson was a Rollin' 90's gang member. Detective Reed also knew that Anderson had felony drug convictions. Acting on the informant's tip, Detective Reed checked the Honda's registration and learned that the car was registered to Lameisha Blackshire at 3344 Southwest 24th Street in Oklahoma City.

On February 17, 2015, Detective Reed surveilled 3344 Southwest 24th Street. As he drove down the street in an unmarked police car, Detective Reed "passed within a few feet" of Michael Shandelon Brown and Ingram, who were in a grey Kia Forte traveling the other direction. Suppl. R. Vol. III at 296:1–13. Detective Reed took a quick glance at the Kia's occupants, one of whom he believed was Tyree Cade. Detective Reed knew that Cade had an active felony warrant and was wanted in a drug conspiracy investigation. Suppl. R. Vol. III at 289:10–290:3. Detective Reed hadn't previously encountered Brown or Ingram. Rather, Detective Reed thought Brown was Cade because Brown's "features were similar" to Cade's and Detective Reed knew that the residence at 3344 Southwest 24th Street was associated with the Rollin' 90's. *Id.* at 285:22–24, 286:2–5, 289:17–290:3.

Detective Reed continued driving and parked in a vacant house's driveway down the street. Meanwhile, Brown and Ingram parked in front of 3344 Southwest 24th Street. Detective Reed positioned himself so he could see the Kia and reached for a pair of binoculars to see whether he was correct about Cade, but by the time he got situated, Brown and Ingram were already on the front porch of 3344 Southwest 24th Street, headed inside.

Next, Detective Reed called the Oklahoma City Police Department's Gang Enforcement Unit, specifically, Lieutenant Robert Coniglione, to tell him that he believed Cade was at 3344 Southwest 24th Street. Detective Reed asked Lieutenant Coniglione whether he "and his troops could come over" to the house "to set up on" the Kia, so they "could stop it to see if Tyree Cade was in the car." Suppl. R. Vol. III 290:19–21. After requesting assistance, Detective Reed surveilled the house for another fifteen minutes, during which time he saw Anderson (the alleged white Honda Civic crack-cocaine dealer) come out of the house and lean into the Honda parked in the driveway. He didn't see whether Anderson put something into the car or took anything out of it. A few minutes later, Detective Reed saw Brown and Ingram leave the house, get back into the Kia, and drive away. Detective Reed noticed that the person he believed might be Cade, but who was actually Brown, was driving the car, and that Ingram, whom Detective Reed hadn't encountered before this incident, was the passenger. He also noticed that when Ingram got back into the Kia, he was carrying a black bag.

3

Lieutenant Coniglione and his riding partner, Sergeant Andrew Ritchie, responded to Detective Reed's assistance request. When they arrived in the area, Detective Reed told Lieutenant Coniglione which direction the Kia had traveled. Lieutenant Coniglione and Sergeant Ritchie quickly found the Kia in the neighborhood of 3344 Southwest 24th Street and followed it by two or three car lengths. While following the Kia, Lieutenant Coniglione saw the Kia fail to "maintain its position in its lane" and "drift[] left of center" in the road. Suppl. R. Vol. III at 309:18–20. Lieutenant Coniglione testified that he saw the Kia cross the center of the road by about "a quarter of a vehicle width." *Id.* at 312:9–11. The time was 3:15 p.m., and the officers' view was unobstructed. Even though the road didn't have a painted center line where Lieutenant Coniglione had seen Brown drift left of center, he could see a yellow center line farther down the "[r]elatively straight" road. *Id.* at 310:13–18, 311:7–11, 313:13–16.

Sergeant Ritchie and Lieutenant Coniglione activated their car's emergency lights, and the Kia stopped. Lieutenant Coniglione and Sergeant Ritchie stepped out from the car and walked toward the Kia. When they reached the rear bumper, "the driver just put [the Kia] in gear and fled the scene." *Id.* at 316:2–4. Sergeant Ritchie and Lieutenant Coniglione returned to their car and "chased after" the Kia, reaching speeds of 60 miles per hour in a 25-mile-per-hour zone. *Id.* at 98:12–17, 316:5–9. While taking a turn too fast, the driver lost control of the Kia, crashed into the front yards of some houses lining the street, and became stuck.

4

In response to radio transmissions, Detective Wes Cadena and Sergeant George Anderson separately responded to the car chase, learning from a dispatcher that the Kia had crashed. Upon arriving, the two officers saw Brown and Ingram flee the Kia on foot. The two officers chased Brown and Ingram through a yard, past a guard barrier, down an embankment, and up a creek bed before finally subduing and arresting them.

After Detective Cadena and Sergeant Anderson arrested Brown and Ingram, Lieutenant Coniglione searched the Kia and found the black bag that Detective Reed had seen Ingram carry from Anderson's house. The bag contained 650.7 grams of crack cocaine and $4,980. Lieutenant Coniglione found the bag on the front-passenger-side floorboard. The government charged Brown and Ingram each with possessing more than 280 grams of cocaine base with intent to distribute it, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A).

## II.    *The district court proceedings*

Before trial, Brown filed a motion to suppress the crack cocaine and money seized from the Kia, arguing that the traffic stop was unjustified at its inception. Ingram didn't join the motion. Brown argued that "the isolated incident of drifting left of center, unaccompanied by other driving irregularities," is not a traffic violation under Oklahoma City ordinances. Suppl. R. Vol. V at 5. Specifically, Brown argued that if a roadway lacks clearly marked traffic lanes, then § 32-191(b) of the Oklahoma City Municipal Code (entitled "Changing lanes") merely requires that "vehicles shall nevertheless keep in line or follow a straight course ***as nearly as***

5

_**practical**_ . . ." Suppl. R. Vol. V at 8 (quoting Okla. City Mun. Code ch. 32, art. V § 32-191(b) (1980)). Brown contended that under this forgiving standard, a driver who drifts across the center of a roadway hasn't committed a traffic violation.

The government countered that Oklahoma City ordinance § 32-192 was in fact the traffic law applicable to Brown's case. Section 32-192 provides that "[u]pon all roadways of sufficient width a vehicle _shall_ be driven to the right of the center of the roadway," subject to exceptions not at issue. Okla. City Mun. Code ch. 32, art. V § 32-192 (1980). The district court agreed with the government, concluding that § 32-192's omission of the "as nearly as practical" language used in § 32-191 "[was] a clear indication that strict compliance is required." Suppl. R. Vol. I at 38.

The court also determined that Lieutenant Coniglione was "a credible witness" and that "he observed the vehicle veer into the center lane about a quarter length of the body of the car[.]" _Id._ at 37. Based on Lieutenant Coniglione's testimony, the court found that Brown's left-of-center drift "amount[ed] to an observed traffic violation giving rise to a reasonable inference that a traffic violation ha[d] occurred." _Id._

Ingram and Brown went to trial. During the trial, Ingram didn't object to the admission of the crack cocaine from the Kia. The jury found Ingram guilty of possessing cocaine base with the intent to distribute it. The district court sentenced him to two concurrent life-without-release imprisonment terms because of his two earlier felony drug offense convictions, in line with 21 U.S.C. §§ 851, 841(a)(1), (b)(1)(A). Ingram now appeals.

6

## DISCUSSION

A. *The standard of review*

The parties disagree about the applicable standard of review. Generally, "[w]e review de novo the 'ultimate determination of Fourth Amendment reasonableness.'" *United States v. Little*, 18 F.3d 1499, 1503 (10th Cir. 1994) (en banc) (quoting *United States v. Allen*, 986 F.2d 1354, 1356 (10th Cir. 1993)). When reviewing a district court's denial of a motion to suppress, "we accept the factual findings of the district court . . . unless they are clearly erroneous." *United States v. Gregory*, 79 F.3d 973, 977 (10th Cir. 1996).

But in this case, Ingram didn't file a motion to suppress in the district court, or even join Brown's. Though we ordinarily review claims first raised on appeal for plain error, we apply a different standard for suppression issues not raised in the district court.

In *United States v. Burke*, 633 F.3d 984, 988 (10th Cir. 2011), we held that a Rule 12 "suppression argument raised for the first time on appeal is waived (i.e., completely barred) absent a showing of good cause," even though we had in earlier cases engaged in plain-error review after the defendant failed to make the suppression motion before trial. Relying on *Burke*, the government argues that Ingram's suppression argument is barred. Appellee Br. at 9.

We decided *Burke* before the Advisory Committee on Criminal Rules's recent amendments to Rule 12. Subsection (e) of the version of Rule 12 then in force provided that "[a] party waives any Rule 12(b)(3) defense, objection or request not

7

raised by the deadline the court sets under Rule 12(c) or by an extension the court provides. For good cause, the court may grant relief from the waiver." Fed. R. Crim. P. 12(3) (West 2013). But in 2014 the advisory committee deleted subsection (e) from Rule 12 and expanded subsection (c) into three parts. Fed. R. Crim. P. 12(c) (West 2017). The committee replaced Rule 12(e) with new Rule 12(c)(3) which states, "If a party does not meet the deadline for making a Rule 12(b)(3) motion, the motion is untimely. But a court may consider the defense, objection, or request if the party shows good cause." *Id.* at (c)(3).

The advisory committee stated that it had removed the word "waiver" from Rule 12 "to avoid possible confusion." Fed. R. Crim. P. 12(c), advisory committee's note to 2014 amendments. The committee explained that

> [a]lthough the term waiver in the context of a criminal case ordinarily refers to the intentional relinquishment of a known right, Rule 12(e) has never required any determination that a party who failed to make a timely motion intended to relinquish a defense, objection, or request that was not raised in a timely fashion.

*Id.*

The government argues that because the committee notes state that "[n]ew paragraph 12(c)(3) retains the existing standard for untimely claims," the 2014 amendments weren't meant to substantively change Rule 12. Appellee's Br. at 10 n.3 (quoting Fed. R. Crim. P. 12(c), advisory committee's note to 2014 amendments). And so, according to the government, *Burke* remains good law and bars Ingram from first raising a suppression issue on appeal.

8

The Sixth Circuit disagreed with this same argument in *United States v. Soto*, 794 F.3d 635, 650–52 (6th Cir. 2015). The court concluded that the 2014 advisory committee had consciously decided to omit the word "waiver" from Rule 12 to clarify that "courts may no longer treat a party's failure to file a timely 12(b)(3) pretrial motion as an intentional relinquishment of a known right." 794 F.3d at 652.

Ingram argues that he didn't "knowingly and voluntarily" waive his right to challenge the legality of the stop. Appellant's Reply Br. at 2, 4. This argument tracks the reasoning of *Soto* because at bottom, Ingram contends that failing to raise a suppression claim under Rule 12 doesn't waive that claim. And if the *Soto* court and Ingram are correct, then Ingram is entitled to plain-error review.

Our circuit hasn't addressed whether the advisory committee's 2014 Rule 12 amendments affect our holding in *Burke*. And we decline to settle the issue now. Instead, even if the plain-error standard[1] governed Ingram's suppression claim, Ingram would falter on its first prong. The district court didn't err in finding that Lieutenant Coniglione saw Brown commit a traffic violation by crossing the center of the road.

B. *The reasonableness of the traffic stop*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."

---

[1] To show plain error, a party must demonstrate that the district court committed (1) an error, (2) that is plain, (3) that affects her substantial rights, and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings. *United States v. Olano*, 507 U.S. 725, 732 (1993).

9

U.S. Const. amend. IV. A traffic stop is reasonable under the Fourth Amendment if (1) it is justified at its inception, and (2) the resulting search and seizure was reasonably related in scope to the circumstances that justified the initial stop. *Terry v. Ohio*, 392 U.S. 1, 19–20 (1968). Whether the stop was justified at its inception depends on "the totality of the circumstances." *United States v. Salazar*, 609 F.3d 1059, 1068 (10th Cir. 2010). To stop Brown and Ingram, Lieutenant Coniglione needed "a particularized and objective basis" for doing so. *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks omitted). If police officers witness a traffic violation, then the traffic stop is justified at its inception. *United States v. Eckhart*, 569 F.3d 1263, 1271 (10th Cir. 2009).

Ingram advances two arguments challenging the justification of the stop: (1) that he didn't commit a traffic violation under § 32-191(b) of the Oklahoma City Municipal Code, which requires only that a driver "follow a straight course as nearly as practical"; and (2) that the stop was pretextual because "the evidence suggests that a reasonable officer would not have stopped [the Kia] without the invalid purpose of obtaining evidence" of drug trafficking. Appellant's Op. Br. at 1–2, 20. We will address each argument in turn.[2]

---

[2] The government makes three alternative arguments: (1) that Lieutenant Coniglione and Sergeant Ritchie had independent reasonable suspicion to stop the Kia based on Detective Reed's having witnessed events consistent with drug trafficking while surveilling 3344 Southwest 24th Street; (2) that because Ingram was never seized, evidence of the crack cocaine found in the Kia shouldn't be suppressed; and (3) that the seized crack cocaine was abandoned property and not entitled to Fourth Amendment protection. Appellee Br. at 22–23, 22 n.8, 27. Because we

10

*1. The traffic violation*

Ingram argues that a driver who just once crosses over a road's unmarked center hasn't violated Oklahoma City traffic laws. Appellant's Op. Br. at 10. He notes that § 32-191(b) of the Oklahoma City Municipal Code merely requires that a driver on a road with unmarked traffic lanes "follow a straight course 'as nearly as practical.'" Appellant's Br. at 10–11 (quoting Okla. City Mun. Code ch. 32, art. V § 32-191(b) (1980)). Ingram argues that lawmakers adopted the "as nearly as practical" language in § 32-191(b) because maintaining a straight course in an unmarked traffic lane is difficult, so mistakes such as drifting over the center of the road just once are understandably unavoidable and don't amount to a violation of the ordinance. Appellant's Op. Br. at 11.

In response, the government argues that § 32-191(b) applies only when a driver is changing lanes and that Brown wasn't doing so when he momentarily drifted across the center of the roadway. Appellee's Br. at 19 (quoting Okla. City Mun. Code ch. 32, art. V § 32-191(b) (1980)). The government asserts that Brown violated Oklahoma City Municipal Code § 32-192, titled "Driving on right side of roadway," which requires "[u]pon all roadways of sufficient width a vehicle shall be driven to the right of the center of the roadway." Okla. City Mun. Code ch. 32, art. V § 32-192 (1980).

---

determine that the officers had a legal basis to stop Brown for crossing the center of the road, we have no need to address these arguments.

We agree with the government. Section 32-191 is titled "Changing lanes," and concerns just that. Ingram ignores the context that § 32-191(a) helpfully provides:

> Whenever any roadway has been divided into two or more clearly marked lanes for traffic . . . a vehicle shall be driven as nearly as practical entirely within a single lane *and shall not be moved* from such lane until the driver has first ascertained that such movement can be made with safety . . .

Okla. City Mun. Code ch. 32, art. V § 32-191(a) (1980) (emphasis added). Sections 32-191(a) and 32-191(b) are part of the same ordinance and relate to each other. Section 32-191(b) itself states that if a driver needs to stop adjacent to a curb or pass another car, he must ascertain whether the movement can be made safely and provide a signal that he "inten[ds] to change lanes." Okla. City Mun. Code ch. 32, art. V § 32-191(b) (1980). Ingram never contends that Brown was attempting to change lanes when he drifted left of center, so § 32-191(b) doesn't apply.

In contrast, § 32-192 requires drivers to remain right of the center of the roadway. Under § 32-192's plain language, Lieutenant Coniglione and Sergeant Ritchie were justified in stopping Brown for failing to remain right of the center of the roadway.[3]

_____

[3] Further, Brown likely committed a traffic violation even under his cited ordinance requiring compliance "as nearly as practical." *See United States v. Alvarado*, 430 F.3d 1305, 1308–09 (10th Cir. 2005) (concluding that crossing the right fog line just once in optimal road conditions justified a stop where the state statute required compliance only as nearly as practical); *United States v. Zabalza*, 346 F.3d 1255, 1258 (10th Cir. 2003) (concluding that a vehicle crossing the center of a roadway twice in optimal conditions justified a stop where the state statute required staying in one lane as nearly as practical). *But see United States v. Gregory*, 79 F.3d 973, 978–79 (10th Cir. 1996) (concluding that a driver on a winding road didn't

The district court correctly concluded that Lieutenant Coniglione and Sergeant Ritchie had a full basis to stop Brown for a traffic violation. So even if we were to grant Ingram plain-error review, he still couldn't prevail—he has failed to show any error.

## 2. *The allegedly pretextual stop*

Ingram next argues that Lieutenant Coniglione and Sergeant Ritchie used the traffic stop as a pretext for stopping the Kia based on their suspicions that Brown and Ingram had been participating in drug trafficking at Anderson's house. Appellant's Op. Br. at 20. He claims that "the officers would not have stopped [the] vehicle on the basis of driving left of center, without the officers' primary intention and illegitimate motivation of obtaining evidence of drug trafficking." Appellant's Opening Br. at 20. In this regard, Ingram primarily relies on *United States v. Smith*, 799 F.2d 704, 710–11 (11th Cir. 1986). Appellant's Op. Br. at 17–21.

---

commit a traffic violation that justified a traffic stop when the driver crossed the right shoulder emergency-lane line once during very windy conditions); and *United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000) (finding no probable cause to pull over a motor home where it partially weaved into the emergency lane for a few feet for a limited period of time and the operative statute required drivers to stay in their lane only as nearly as practical).

Here, Brown crossed the center of the road, and the district court found that "the weather was sunny and not particularly windy, there were no other pedestrians, objects, or traffic nearby to justify [Brown's] swerving, and the driving conditions were as good as any." Suppl. R. Vol. I at 38 (internal quotation marks omitted). So it was practical for Brown to keep his car within the lane and not cross the center of the road.

In *Smith*, the Eleventh Circuit concluded that a state trooper had lacked probable cause to stop a car where the driver slightly weaved within his own lane of traffic, didn't look at the trooper in the marked patrol car, and drove an out-of-state car at 3 a.m. in a manner consistent with that of a drug courier. 799 F.2d at 706–07. The court found that the officer had begun to pursue the car "before he observed any 'weaving' and, [that] even after he stopped the car, he made no investigation of the possibility of intoxication." *Id.* at 710. Moreover, the court explained "that a reasonable officer would not have stopped the car absent an additional, invalid purpose" and rejected the traffic stop as pretextual. *Id.* at 711.

But *Smith* must succumb to the rule given in *Whren v. United States*, 517 U.S. 806, 813 (1996).[4] In *Whren*, the Court held that "[s]ubjective intentions [of law enforcement officers] play no role in ordinary, probable-cause Fourth Amendment analysis." 517 U.S. at 813. The Court foreclosed "any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved." *Id.*

In sum, whether the officers pursued the Kia before observing a traffic violation "is legally irrelevant." *United States v. Polly*, 630 F.3d 991, 997 (10th Cir. 2011). Again, Ingram can't satisfy the first prong of plain-error analysis because the district court didn't err.

---

[4] The Eleventh Circuit has ruled that *Whren* abrogated *Smith*. *See Riley v. City of Montgomery*, 104 F.3d 1247, 1251 (11th Cir. 1997).

## CONCLUSION

For the reasons above, we affirm Ingram's conviction.

Entered for the Court

Gregory A. Phillips
Circuit Judge