FILED
United States Court of Appeals
Tenth Circuit

December 7, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

JOSE LUIS PENA-MONTES,

Defendant–Appellant.

No. 08-2169

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 1:07-CR-02436-LH-1)**

Stephen P. McCue, Federal Public Defender, Albuquerque, New Mexico,
for Defendant–Appellant.

Terri J. Abernathy, Assistant United States Attorney (Gregory J. Fouratt, United
States Attorney, with her on the briefs), Office of the United States Attorney for
the District of New Mexico, Las Cruces, New Mexico, for Plaintiff–Appellee.

Before **LUCERO**, **MURPHY**, and **O'BRIEN**, Circuit Judges.

**LUCERO**, Circuit Judge.

This Fourth Amendment appeal arises from a traffic stop in Albuquerque,

New Mexico. In the course of that stop, a police officer questioned Appellant

Jose Luis Pena-Montes, the vehicle's passenger. This led to his arrest and the discovery that Pena-Montes had been previously removed from the United States after a felony conviction. See 8 U.S.C. § 1326(a), (b). Although the officer initiated the stop based on the reasonable belief that the vehicle lacked a license plate, after he pulled it over, he observed that it did, in fact, display a "dealer tag" but continued the detention to question the vehicle's occupants to determine whether the plate's use was lawful. Because we conclude that the officer could not have reasonably suspected criminal activity after he saw a dealer plate but before he began questioning the vehicle's occupants, we hold that the continued detention of Pena-Montes violated the Fourth Amendment's prohibition against unreasonable searches and seizures.

Notwithstanding the foregoing treatment of the primary issue on appeal, when evidence of an individual's identity is discovered through routine booking procedures incident to an unlawful arrest, that evidence is not suppressed unless the arrest was purposefully exploited to learn the identity. See United States v. Olivares-Rangel, 458 F.3d 1104, 1115-16 (10th Cir. 2006). Having rejected Pena-Montes' Fourth Amendment argument, the district court had no occasion to determine the purpose of Pena-Montes' booking. We thus cannot determine whether the evidence of Pena-Montes' identity must be suppressed on the record before us. Exercising jurisdiction under 28 U.S.C. § 1291, we vacate the

judgment of the district court and remand for further proceedings consistent with this opinion.

**I**

**A**

Before we recount the material facts, it is necessary to resolve confusion engendered by the terminology used in the record. The district court referred to the tag at issue as a "dealer demonstration tag." In their briefing, the government and Pena-Montes use the term "dealer tag." However, both of these terms are foreign to New Mexico law. Rather, the New Mexico Statutes regulate "demonstration permits" and "dealer plates," both of which are issued to licensed dealers. Compare N.M. Stat. § 66-3-6(F) (demonstration permits), with § 66-3-401 (dealer plates).

During trial, the officer effectuating the stop testified that the sole purpose of the type of plate displayed is the demonstration of vehicles, a characteristic consistent with demonstration permits. See N.M. Stat. § 66-3-6(F). However, in the proceedings below, the government volunteered N.M. Stat. § 66-3-401 as the operative statute. In its order denying the motion to suppress, the district court cited that same provision. Similarly, both parties cite § 66-3-401 before this court.

When reviewing the denial of a motion to suppress, we "view[] the evidence in the light most favorable to the government and accept[] the factual

findings of the district court unless they are clearly erroneous." United States v. Karam, 496 F.3d 1157, 1161 (10th Cir. 2007). Though factual ambiguity exists, it is unnecessary for this court to determine whether construing the record to suggest a dealer plate or a demonstration permit would be more favorable to the government. In agreeing on the operative statute, the parties treat as undisputed fact that the Yukon bore a dealer plate; and in basing its ruling on § 66-3-401, the district court implicitly made a factual finding to that effect. Such a finding was not clearly erroneous. We therefore premise our analysis on the fact that the Yukon bore a dealer plate, viewing that factual determination in the light most favorable to the government. With this issue resolved, we proceed.

**B**

At approximately 9:00 p.m. on the evening of November 9, 2007, Officer Michael Hernandez of the Albuquerque Police Department ("APD") observed a GMC Yukon traveling eastbound on Central Avenue. Hernandez did not see a license plate on the Yukon, a violation of New Mexico law, prompting him to engage his emergency equipment and pull the vehicle over. As Hernandez approached the vehicle on foot, he observed a dealer plate displayed in the rear window of the vehicle. Undaunted, he continued to approach the driver.

After the driver identified himself as Jeremy Crain, Hernandez asked for his driver's license, vehicle registration, and proof of insurance. Crain produced his driver's license and stated that he owned the vehicle, but he could not produce

the registration, bill of sale, or proof of insurance, leading Hernandez to suspect the vehicle was stolen. Hernandez knew that within the past year or so, auto dealerships in and around Albuquerque had reported car thefts during which demonstration permits and dealer plates were also taken and used to disguise stolen cars. Upon questioning, Crain told Hernandez that he had a handgun in the car. Hernandez then ordered both occupants to exit the vehicle and wait near the curb while he radioed in the vehicle identification number ("VIN").

After Hernandez learned that the vehicle had not been reported stolen, a second APD Officer, Daniel Morales, arrived on scene. The officers patted down Crain and his passenger, later revealed to be Pena-Montes. Morales took from the passenger two cell phones, a pair of sunglasses, and $1,800. Because the passenger did not have identification, Hernandez then asked for his name, date of birth, and social security number. The passenger gave his name as Marcus Garcia and claimed to have an Arizona driver's license, but Hernandez could not find a database record matching the name, social security number, and birth date "Marcus Garcia" provided.

Suspecting the passenger was lying about his identity, Hernandez questioned Crain and the passenger further. The passenger gave a different birth date and social security number than he had previously, and his and Crain's explanations of how they knew each other were also at odds. Based on these answers, Hernandez handcuffed the passenger and took him into custody for

- 5 -

concealing his identity.[1]  See N.M. Stat. § 30-22-3.   He then transported the passenger first to APD's identification unit, then to a detention center for booking.  After being fingerprinted twice, the passenger was identified through a national database as Jose Luis Pena-Montes.

A day later, Immigration and Customs Enforcement ("ICE") interviewed Pena-Montes at the detention center.  ICE records showed that he had previously been convicted of a felony in California state court and subsequently deported.  Based on this history, Pena-Montes was indicted on one count of reentry of a removed alien after a felony conviction in violation of 8 U.S.C. § 1326(a) and (b).

After being indicted, Pena-Montes moved to suppress all evidence derived from the traffic stop, including his identity.  The district court held a hearing on the motion, during which Hernandez and Pena-Montes testified.  Concluding that Hernandez reasonably suspected illegal activity when he initiated questioning of Pena-Montes and that probable cause for arrest arose from Pena-Montes' inconsistent answers, the court denied Pena-Montes' suppression motion.

Following that denial, Pena-Montes entered a conditional guilty plea, reserving his right to appeal the suppression ruling.  This appeal followed.

---

[1] The parties also contest whether, based on these circumstances, Hernandez had probable cause under New Mexico's law regarding identity concealment, but we conclude that it is unnecessary to reach that issue.  We caution the reader not to interpret this mere recitation of the facts to bear on this legal question.

## II

Although we view the evidence in the light most favorable to the government, whether a seizure is reasonable under those facts is a question of Fourth Amendment law we review de novo. Karam, 496 F.3d at 1161. Similarly, when a question of state law is implicated, as here, we "[r]eview[] the district court's construction of . . . state law de novo." United States v. DeGasso, 369 F.3d 1139, 1144 (10th Cir. 2004).

A routine traffic stop is indisputably a seizure within the meaning of the Fourth Amendment. United States v. Rodriguez-Rodriguez, 550 F.3d 1223, 1226 (10th Cir. 2008). However, because a traffic stop is "necessarily [a] swift action predicated upon the on-the-spot observations of the officer on the beat," an officer need only reasonably suspect that a crime is in the offing to justify such a detention. Terry v. Ohio, 392 U.S. 1, 20-21 (1968); see also Karam, 496 F.3d at 1161. Terry set forth a two-step framework for determining the constitutional scope of a traffic stop: (1) the stop must be "justified at its inception," and (2) the resulting detention must be "reasonably related in scope to the circumstances that justified the stop in the first place." United States v. Winder, 557 F.3d 1129, 1133-34 (10th Cir. 2009) (quotations omitted). "Generally, an investigative detention must last no longer than is necessary to effectuate the purpose of the stop." Id. at 1134 (quotation omitted).

Reasonable suspicion arises when "an officer of reasonable caution" has a "particularized and objective basis for suspecting the person stopped of criminal activity" judged against the totality of the circumstances. Id. at 1133-34 (quotations omitted). A mere hunch or conjecture will not suffice. Karam, 496 F.3d at 1162; see also United States v. Caro, 248 F.3d 1240, 1246 (10th Cir. 2001). Although the detaining officer's subjective motivations are irrelevant to our inquiry, we may weigh objectively reasonable mistakes of fact made by the officer in favor of reasonable suspicion. Winder, 557 F.3d at 1134.

**A**

We need not linger on the question of whether Hernandez's stop of the Yukon was "justified at its inception." Id. Hernandez mistakenly believed that the vehicle did not display a license plate or registration permit in violation of N.M. Stat. § 66-3-18. Pena-Montes concedes that this mistake was objectively reasonable under the circumstances. See United States v. Concepcion-Ledesma, 447 F.3d 1307, 1312 (10th Cir. 2006) (Terry stop justified at inception when defendant concedes officer could not see license plate or temporary registration). Thus, we focus our inquiry on whether the resulting detention was "reasonably related in scope to the circumstances that justified the stop in the first place." Winder, 557 F.3d at 1134.

**B**

**1**

The government acknowledges that the scope of the traffic stop initially extended only to investigating Hernandez's belief that the vehicle lacked a license plate. "As a general rule, once an officer's purpose in a traffic stop based on probable cause or reasonable suspicion is complete, the officer must let the person go." United States v. Ozbirn, 189 F.3d 1194, 1199 (10th Cir. 1999). Nonetheless, the government argues that Hernandez was justified in continuing the detention even after he saw a dealer plate on the vehicle to determine whether it was being used lawfully and to investigate whether the Yukon was stolen. A traffic stop "may be expanded beyond its original purpose if during the initial stop the detaining officer acquires reasonable suspicion of [additional] criminal activity." United States v. Clarkson, 551 F.3d 1196, 1201 (10th Cir. 2009) (quotation and alteration omitted). Accordingly, we consider whether Hernandez reasonably suspected additional criminal activity after he viewed the dealer plate.

As did the district court, we consider the restrictions New Mexico places on the use of dealer plates to be the key to our analysis—but to opposite effect. According to the district court, "Officer Hernandez, upon seeing the dealer demonstration tag, had reasonable suspicion to continue to question the driver about the tag, because, given the time of night, it did not appear that the driver was properly using the tag in violation of [N.M. Stat.] §§ 66-8-2 and 66-3-401.

- 9 -

These statutes limit the lawful use of dealer plates to certain circumstances."[2] At the hearing on the motion to suppress, Officer Hernandez testified that it appeared to be a violation because "[t]he dealer tags are for auto dealerships, and based upon the operations of the auto dealership, their sole purpose is for demonstrating the vehicle or for sales of the vehicle. Usually, it's for test driving purposes or a demo vehicle." He went on to explain that dealer plates were therefore usually in use during "what you would call bank hours, eight to five," when dealerships are typically open. In this respect, both the district court and Officer Hernandez made errors of New Mexico law: the use of dealer plates is not limited to a particular time of day, nor is their use limited to demonstration purposes. Simply put, their use is not limited in any way relevant to the circumstances of this case.

New Mexico law describes a number of types of license plates and registration permits, each of which carries a particular set of restrictions. A standard license plate, § 66-3-14, must be displayed on "the vehicle for which it is issued," § 66-3-18, and may no longer be displayed on a vehicle after it is sold except in special circumstances, § 66-3-104. Even in those circumstances, the vehicle may be operated with the plate only after it has been registered to the new owner and a new registration certificate issued. Id.

---

[2] Section 66-8-2 prohibits any improper use of "any certificate of title, registration evidence, registration plate, special plate, validating sticker or permit," and § 66-3-401 governs the operation of vehicles under dealer plates.

"Dealer plates," the type of license plates at issue in this case, are governed by § 66-3-401 to § 66-3-404. They may be issued for "[a]ny vehicle . . . included in the inventory of a dealer," and such a vehicle "may be operated or moved upon the highways for any purpose." § 66-3-401(A) (emphasis added). Unlike with other plates, a vehicle with a dealer plate need not be titled. § 66-3-401(C). As an alternative to using a dealer plate, a dealer may title and register a vehicle in its inventory, in which case it will be issued a standard plate. § 66-3-401(D). Based on the volume of business it does, a dealer is limited in how many plates it may be issued, § 66-3-402, and all dealer plates expire at the end of each calendar year, § 66-3-403. The primary restrictions on dealer plates are: they may not be used on parts or delivery vehicles, towing vehicles, courtesy shuttles, or vehicles loaned to customers for their convenience, § 66-3-402(B); they are not transferable between vehicles without re-registration, § 66-3-401(A); and they may never be transferred between dealers, § 66-3-404. A vehicle with a dealer plate "may be operated or moved upon the highways for any purpose." The statute implies near-equivalence between a dealer plate and a standard license plate. See § 66-3-401(D) ("In lieu of the use of dealer plates pursuant to this section, a dealer may register and title a vehicle included in a dealer's inventory . . . ."). We conclude that the primary purpose of a dealer plate is to allow a dealership to use a small number of untitled vehicles as general purpose vehicles.

- 11 -

Errors made by an officer conducting a traffic stop generally fall into one of two categories: mistakes of fact and mistakes of law. "An officer's reasonable mistake of fact, as distinguished from a mistake of law, may support the probable cause or reasonable suspicion necessary to justify a traffic stop." DeGasso, 369 F.3d at 1144 (citation omitted). An officer's "failure to understand the plain and unambiguous law he is charged with enforcing, however, is not objectively reasonable." Id. (citation omitted). The record is clear that Hernandez extended the traffic stop based on a mistake of law, not a mistake of fact. Once he observed the dealer plate on the vehicle, his mistake of fact—that the vehicle had no plate at all—was corrected, but he continued his investigation because he mistakenly believed that the lawful use of dealer plates was limited to demonstrating vehicles.[3] As explained above, New Mexico places no such limitation on the use of dealer plates; indeed, a dealer plate permits the general use of a vehicle. This mistake of law was immediately compounded, as Hernandez found the use of a dealer plate suspicious because vehicle demonstrations typically take place during business hours. It was this combination of circumstances that led Hernandez to suspect that the Yukon was stolen and thus question Crain and Pena-Montes.

---

[3] We express no opinion on whether a more limited-use tag would have rendered Hernandez's suspicion of criminal activity reasonable.

Absent this error of law, it becomes clear that reasonable suspicion was dispelled as soon as Hernandez discovered his mistake of fact—that is, when he saw that the Yukon did, in fact, have a license plate permitting general purpose use. The scenario is on all fours with United States v. McSwain, 29 F.3d 558 (10th Cir. 1994). There, a state trooper pulled over McSwain because he believed the vehicle's temporary registration sticker was unlawfully displayed when in fact it was a type of sticker with which the officer was unfamiliar. Id. at 560. McSwain conceded that this mistaken belief justified the initial stop. As here, however, the trooper discovered his mistake as he approached the car, before he questioned the driver. This discovery wholly dispelled his reasonable suspicion:

> Once Trooper Avery approached the vehicle on foot and observed that the temporary sticker was valid and had not expired, the purpose of the stop was satisfied. Trooper Avery's further detention of the vehicle to question Mr. McSwain about his vehicle and travel itinerary and to request his license and registration exceeded the scope of the stop's underlying justification.

Id. at 561. Like the trooper in McSwain, Hernandez's investigation was complete when he saw that the vehicle actually had a plate—before he began questioning the vehicle's occupants.[4]

---

[4] The government contends that McSwain is distinguishable because, in that case, the trooper only suspected a traffic violation, not that the car was stolen. But the subject of Hernandez's actual suspicion is of no moment; the question is whether the information known to the officer supported some objectively reasonable suspicion of criminal activity.

**2**

Nonetheless, the government argues that Hernandez was justified in continuing the detention, even after he saw the dealer plate on the vehicle, to determine whether it was being used lawfully and to investigate whether the Yukon was stolen. A traffic stop "may be expanded beyond its original purpose if during the initial stop the detaining officer acquires reasonable suspicion of criminal activity, that is to say the officer must acquire a particularized and objective basis for suspecting the particular person stopped of criminal activity." Clarkson, 551 F.3d at 1201 (quotation and alteration omitted). Accordingly, we consider whether Hernandez reasonably suspected additional criminal activity after he viewed the dealer plate.

The government offers three factors in support of its contention that Hernandez possessed reasonable suspicion that the vehicle was stolen or was improperly using the plate. First, Hernandez testified that "a lot of narcotics dealing as well as prostitution" occurred in the area of the stop. Second, Hernandez knew that dealerships in the Albuquerque area had experienced car thefts in the preceding "year or so" in which the thieves also stole dealer plates. Lastly, Hernandez testified that, in his experience, dealer plates are typically used during business hours. This contention is based on the following testimony:

> Q. . . . [W]ith regard to these dealer tags, do you have an understanding as to what the purpose of that tag is? And if so, can you describe it for me?

A.  The dealer tags are for auto dealerships, and based upon the operations of the auto dealership, their sole purpose is for demonstrating the vehicle or for sales of the vehicle.  Usually, it's for test driving purposes or a demo vehicle.

Q.  In your experience, do you typically—would you typically see that type of tag in use during the daytime?

A.  During the daytime, yes, as in from what you would call bank hours, eight to five.  Usually not seen driven around for just[,] I guess[,] owner purposes.

The three factors identified by the government do not provide the particularized reasonable suspicion necessary to justify detention once Hernandez observed the plate.  The first two factors provide little heft in the reasonable suspicion analysis.  That the stop occurred in a high-crime area is a relevant consideration but does not permit police to detain an individual without additional, particularized observations.  See United States v. Dennison, 410 F.3d 1203, 1207-08 (10th Cir. 2005).  Further, we hesitate to give this factor much weight when the area was not known for car theft, but for narcotics and prostitution.  Cf. United States v. Samuels, 493 F.3d 1187, 1192-93 (10th Cir. 2007) (suspicion of drug dealing reasonable when "drug transactions occurred often in the convenience store itself and the area surrounding it"); United States v. Rice, 483 F.3d 1079, 1081 (10th Cir. 2007) (suspicion of burglary reasonable when the officer had "had previously responded to shootings, murders, and burglaries nearby"); Dennison, 410 F.3d at 1205 (suspicion of car theft reasonable at an "apartment complex that had a high incidence of nighttime car theft").

Similarly, the fact that stolen dealer plates had been used to disguise stolen vehicles in the Albuquerque area within "a year or so" of the stop is of limited relevance. It provides general background, but given the size of Albuquerque and the time span involved, it is unquestionably not particularized to the actual plate Hernandez observed.

Although ultimately insufficient, the time of day, the final factor cited by the government, provides greater support for its position. Crediting Hernandez's testimony that it was unusual to see a dealer plate outside of "bank hours," the district court held:

> Officer Hernandez, upon seeing the dealer demonstration tag, had reasonable suspicion to continue to question the driver about the tag, because, given the time of night, it did not appear that the driver was properly using the tag in violation of [N.M. Stat.] §§ 66-8-2[5] and 66-3-401. These statutes limit the lawful use of dealer plates to certain circumstances.

In defense of this proposition, the government argues that "dealerships do not have carte blanche to use the tags in any way they see fit." However, it is patently insufficient that the law contains restrictions. There must exist a "particularized and objective basis for suspecting the particular person stopped" is violating one or more such restrictions. Clarkson, 551 F.3d at 1201. Yet the government wholly fails to connect the prohibitions contained in § 66-3-401 to the encounter under consideration in any meaningful way. It may have been

---

[5] Section 66-8-2 prohibits the improper use of license plates and registration permits generally.

unusual to see dealer plates at 9:00 p.m., but none of the restrictions in § 66-3-401 is more likely to be violated at this hour than at any other.

The New Mexico Court of Appeals has expressly established that the Motor Vehicle Code contains no time-of-day restrictions. In State v. Aguilar, 155 P.3d 769 (N.M. Ct. App. 2007), the New Mexico Court of Appeals faced a very similar set of circumstances: At 2 a.m., a state police officer pulled over a vehicle because it did not appear to have a license plate. Id. at 770-71. After pulling the car over, he was able to see a temporary demonstration permit in the rear window, but because he knew that "a lot of temporary dealer tags are stolen and misused" and he "thought the possibility that a person would be demonstrating a vehicle at 2 a.m. was unreasonable," he continued the detention and questioned the driver. Id. at 771. The New Mexico Court of Appeals explained:

> [T]he statute does not provide any time-of-day limitation for the activities permitted with the use of a temporary demonstration plate. Accordingly, it is legal to allow an overnight test drive of a vehicle, or even a few days' test driving. There is nothing unreasonable about such a practice. Thus, the facts relied upon by the officer were evidence of neutral conduct—conduct that is permissible under [the statute].

Id. at 773.[6] The government argues that Aguilar interpreted a different statute

than the one at issue here, but the distinction is of no moment. In Aguilar, § 66-

3-6(F), the provision governing demonstration permits, was at issue. The

permissible uses of demonstration permits are also permissible uses of dealer

plates, as a vehicle displaying the latter may be used "for any purpose." § 66-3-

6(F).

The government cites Gross v. Pirtle, 116 F. App'x 189 (10th Cir. 2004)

(unpublished), for the proposition that it is "reasonable for [an officer] to want to

ensure use of a dealer plate was lawful." Id. at 198. Gross, however, did not

announce a blanket rule permitting police to detain every car bearing dealer

plates; it simply concluded reasonable suspicion arose on the facts presented. In

that case, an officer "observed that [the detained vehicle] was littered with

receipts leading him to become suspicious regarding the use of the vehicle, in

particular, whether the vehicle was being used as a parts vehicle." Id. at 199.

Relying on the prohibition in § 66-3-401(B) against the use of dealer plates on a

_____

[6] As we do here, the Aguilar court reviewed the denial of a motion to suppress, and it reversed and remanded with instructions to vacate the judgement and sentence entered below. Aguilar, 155 P.3d at 775. However, we do not defer to a state court's determination of constitutional reasonableness, and we cite Aguilar here only for its holding regarding the interpretation of New Mexico motor vehicle law. See TMJ Implants, Inc. v. Aetna, Inc., 498 F.3d 1175, 1181 (10th Cir. 2007) ("A federal court must follow the state's highest court in pronouncing or construing the state's common law, statutory law, or constitutional law. But it owes no deference to state-court interpretation of the United States Constitution.").

parts vehicle, this court concluded the officer's actions were supported by reasonable suspicion. Id. at 199 & n.20.

In Gross, the government established reasonable suspicion by citing a particularized observation that led an officer to suspect that the defendant was violating an actual restriction on the use of dealer plates.[7] In sharp contrast, the government here provides no particularized facts and does not even identify the provision Hernandez could have suspected was being violated. It asserts that Hernandez "could not discern whether the dealer tag was issued to this vehicle as required by New Mexico statute, or whether the vehicle was authorized to display the dealer tag." That may well be true, but the government bears the burden of demonstrating reasonableness. See United States v. Guerrero-Espinoza, 462 F.3d 1302, 1305 (10th Cir. 2006). All the government has established is that it is possible to violate § 66-3-401. Absent some particularized, objective basis to believe the dealer plate was actually not issued to this vehicle or that it was actually not authorized to display the plate, further detention was unconstitutional. See Clarkson, 551 F.3d at 1201.

---

[7] We do not suggest that an officer must "be able to quote statutes (or scripture), chapter and verse." United States v. Eckhart, 569 F.3d 1263, 1272 (10th Cir. 2009). In Eckhart, we determined that reasonable suspicion existed when an officer actually observed a violation but was incorrect about which provision of the law his observation violated. Id. As the government does not point to some actual violation, the Eckhart rule does not apply here.

Viewing the government's asserted factors in concert, we conclude that Officer Hernandez lacked a "particularized and objective basis for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002) (quotation omitted). To conclude otherwise would grant permission to the APD to detain and question every car with a dealer plate driving along Central Avenue after most dealerships are closed. Cf. Aguilar, 155 P.3d at 773. We decline to sign this blank check. As in McSwain, the law enforcement officer should not have questioned the driver of the vehicle after his sole cause for suspicion was dispelled. Here, that suspicion was dispelled when Hernandez observed the dealer plate in the Yukon's window. At that point, an officer's permissible conduct is limited: "As a matter of courtesy, the officer could explain to drivers in [these] circumstances the reason for the initial detention and then allow them to continue on their way without asking them to produce their driver's license and registration." McSwain, 29 F.3d at 562. Because Hernandez failed to follow this guidance and chose to further pursue his investigation without a basis in reasonable suspicion, his actions violated the Fourth Amendment.

## III

Our inquiry does not end with the determination that Hernandez unconstitutionally detained and questioned Pena-Montes. The critical evidence necessary to convict Pena-Montes is identity itself: his fingerprints and related records. According to the government, this evidence was obtained "as part of a

routine booking or processing procedure" and thus not subject to the exclusionary rule. See United States v. Olivares-Rangel, 458 F.3d 1104, 1116 (10th Cir. 2006). However, we recognized an exception to the general "routine booking procedure" rule:

> [I]f an illegal arrest was purposefully exploited for the objective of obtaining fingerprints, then the fingerprint evidence must be suppressed. . . . Conversely, in the absence of evidence that the illegal arrest was purposefully exploited for investigatory objectives, fingerprints taken as part of a routine, booking procedure are not fruit of a poisonous tree.

Id. at 1115-16 (citations and footnote omitted). This determination, Olivares-Rangel establishes, depends on "[t]he precise circumstances under which Defendant was arrested and his fingerprints taken." Id. at 1116.

Because the district court found that probable cause supported the continued detention of Pena-Montes, it did not consider the relevance of Olivares-Rangel. The record on appeal contains little evidence as to the purpose of Pena-Montes' fingerprinting. Accordingly, we remand for further fact-finding on this issue.

**IV**

For the foregoing reasons, we **VACATE** the judgment of the district court and the order denying the motion to suppress and **REMAND** for further

proceedings consistent with this opinion.

ENTERED FOR THE COURT


Carlos F. Lucero
Circuit Judge

08-2169, *United States v. Pena-Montes*

**O'BRIEN**, J., concurring.


Jose Luis Pena-Montes was convicted, upon his conditional guilty plea,[1] of illegal re-entry of a removed alien. 8 U.S.C. § 1326(a), (b). He complains about the manner by which the government learned of his illegal presence in the United States. That information came to light because he was a passenger in an improperly registered vehicle, which the police stopped for a traffic violation and thought might be stolen. His presumptively innocent presence in the vehicle was soon eclipsed by his lies to the officers about his identity, which resulted in his arrest for violating New Mexico law – concealing identity from the police.[2] The arrest led to the taking of his fingerprints, which revealed his true identity and his violation of our immigration laws. He sought to have the fingerprints and evidence derived from the fingerprinting process suppressed, arguing it was the product of an illegal detention. Specifically, he claims the officer who stopped

---

[1] Pena-Montes properly reserved the right to appeal from the denial of his motion to suppress evidence. **[R. Vol. I, Doc. 37 at 3]**

[2] Concealing identity consists of concealing one's true name or identity, or disguising oneself with intent to obstruct the due execution of the law or with intent to intimidate, hinder or interrupt any public officer or any other person in a legal performance of his duty or the exercise of his rights under the laws of the United states or of this state.

N.M. Stat. § 30-22-3.

the vehicle unconstitutionally detained him by questioning the driver about the vehicle's registration. The district court properly refused to suppress the evidence, but for the wrong reason. Normally this Court should consider affirming on other grounds, but by its argument in the district court and here, the government has forfeited that remedy.[3] I concur in the majority opinion but write separately to vindicate the arresting officer, who was without fault in this matter.

A traffic stop does not offend the Constitution if it is based upon "an observed traffic violation or . . . reasonable articulable suspicion that [an actual] traffic or equipment violation has occurred or is occurring." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc); *see also United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009). Pena-Montes, quite prudently, does not contest the legitimacy of the initial stop and the events following Officer Hernandez's initial questioning of the driver afford him no basis for relief.[4] Accordingly, the pivotal issue here is exquisitely narrow –

---

[3] *See infra* n.16.

[4] Assuming Hernandez was justified in approaching the vehicle and speaking with the driver about his improper display of the vehicle's registration, he was justified in requesting information from the driver, as he did. He described it in this way:

I approached the driver. I introduced myself, and why I stopped the vehicle. At that time, the driver was identified as Jeremy Crain. At that time, I asked Mr. Crain for his driver's license and proper documentation for the vehicle as in vehicle registration and insurance for the vehicle, at which time he stated he owned the vehicle, gave me his driver's license, and stated that he didn't have any paperwork

(continued...)

- 2 -

whether this officer could legitimately ask questions of the driver after the traffic stop.

Typically after a traffic stop an officer is permitted to engage in a host of investigatory activities. He may ask the driver to produce a valid driver's license, vehicle registration and proof of insurance and he may verify the validity of those documents. *See United States v. Karam*, 496 F.3d 1157, 1161 (10th Cir. 2007). For officer safety, he may order the driver and the passengers to get out of the vehicle. *See Maryland v. Wilson*, 519 U.S. 408, 414-15 (1997) (passengers); *Pennsylvania v. Mimms*, 434 U.S. 106, 111 & n.6 (1977) (driver).[5] He may also ask the passengers for their identification and run a background check on them.

---

[4](...continued)
on the vehicle, so there was no bill of sale. There was no registration. There was no insurance. There was no paperwork on the vehicle.

(R. Vol. III at 8.) Hernandez found the lack of any paperwork regarding ownership of the vehicle to be suspicious and began a more probing investigation, which included reporting the vehicle identification number and checking if the vehicle was reported stolen. When he was told there was a handgun in the vehicle he ordered the occupants to get out and produce identification.

It was at this time that Pena-Montes began lying to the officers about his identity. His story did not make sense and the information he provided could not be confirmed. Ultimately, his lies led to his arrest. Because the information he challenges – his identity – was obtained "as a part of a routine booking or processing procedure" it is not subject to the exclusionary rule. *United States v. Olivares-Rangel*, 458 F.3d 1104, 1112-16 (10th Cir. 2006).

[5] *See also Arizona v. Johnson*, 129 S. Ct. 781, 784 (2009) (holding an officer may order a passenger to get out of a car during a traffic stop and may frisk a passenger for weapons if the officer reasonably suspects the passenger is armed and dangerous).

*See United States v. Rice*, 483 F.3d 1079, 1084 (10th Cir. 2007).[6]  The officer may "also ask the driver questions about matters both related and unrelated to the purpose of the stop, as long as those questions do not prolong the length of the detention."[7]  *Karam*, 496 F.3d at 1161.  In one form or another the "extend the stop" litmus test has been with us for quite awhile.

In *United States v. McSwain*, an officer stopped a vehicle with a temporary sticker in the window but without a front or rear license plate.  29 F.3d at 559-60.  The officer was unable to read the expiration date on the sticker because it appeared to be covered with reflective tape so he stopped the vehicle to verify the validity of the sticker.  As he approached the vehicle on foot the officer determined the temporary sticker to be valid and current.  Nevertheless, he required the driver to produce his license and registration and questioned him about the vehicle and his travel plans.  We decided the officer's detention of the vehicle exceeded the scope of the underlying justification for the stop, saying: "[The officer's] reasonable suspicion regarding the validity of [the driver's]

---

[6] "Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest."  *Arizona v. Gant*, 129 S. Ct. 1710, 1723 (2009).  That holding does not directly bear on the issue here, but it may be a harbinger of something more.

[7] To extend a stop beyond the time necessary to investigate the circumstances justifying the stop and issue a citation, an officer must have reasonable articulable suspicion of other illegal activity.  *United States v. Edgerton*, 438 F.3d 1043, 1047 (10th Cir. 2006); *United States v. McSwain*, 29 F.3d 558, 561 (10th Cir. 1994).

- 4 -

temporary registration sticker was <u>completely dispelled</u> *prior* to the time he questioned [the driver] and requested documentation." *Id*. at 561 (italic emphasis in original, underline emphasis added.) Stated differently, since there was no reason to further investigate, the stop was unreasonably extended.

Continuing the theme is *United States v. Edgerton*, 438 F.3d 1043, 1044 (10th Cir. 2006).[8] There an initial traffic stop was justified because the officer could not, while driving on the highway at night, read a properly displayed temporary sticker from a distance. But, "[o]nce [the officer] was able to read the Colorado tag and deem it unremarkable, <u>any suspicion that Defendant had violated § 8-133 dissipated</u> because the tag was . . . 'in a place and position to be clearly visible.'" *Id*. at 1051 (Emphasis added). Again, the original indication of a traffic violation was wholly vitiated so continued investigation unreasonably extended the stop.

Notable is the uniform theme of our cases, underscoring the requirement that the reasons for the initial stop must be completely dispelled in order for subsequent questioning to be unlawful. Sometimes further investigation is

---

8    The seminal issue in this case is whether the unobscured temporary Colorado registration tag, displayed consistent with Colorado law in the rear window of Defendant's vehicle but illegible from a distance due to nighttime conditions, constituted a violation of Kansas law, thereby justifying Defendant's continuing detention–a detention which led to Defendant's consent to search and discovery of the contraband.

*Edgerton*, 438 F.3d at 1045.

- 5 -

warranted. *See, e.g., United States v. Eckhart*, 569 F.3d 1263, 1273 (10th Cir. 2009) (holding a trooper's request for a driver and passenger's identification and his questioning of them did not violate the Fourth Amendment because he observed an actual traffic violation after stopping the defendants' vehicle and thus his reasonable suspicion was not dispelled); *United States v. Concepcion-Ledesma*, 447 F.3d 1307, 1314 (10th Cir. 2006) (holding it was reasonable for a trooper "to issue a written warning, verify [the defendant]'s license and registration information, and ask preliminary questions about travel plans" because the trooper saw the defendant's registration tag displayed in an unlawful manner, even after he approached the vehicle); *United States v. DeGasso*, 369 F.3d 1139, 1149 (10th Cir. 2004) (upholding a trooper's detention of a motorist because the lettering on a license plate was not 'clearly visible,' as the law required, even though the trooper was able to read the plate as he approached the vehicle). Like the original stop, a new or continuing violation of traffic or equipment laws justifies further investigation and, for that reason, does not unreasonably extend the stop.

When Officer Hernandez saw no license plate on the Yukon (the subject vehicle) he activated his emergency equipment and stopped it. He reported the stop to dispatch and described the vehicle. During this time another officer, Morales, arrived on the scene. They both approached the Yukon, Hernandez on the driver's side and Morales on the passenger's side. As Hernandez

- 6 -

"approached the vehicle doing [his] initial with [his] flashlight . . . [he] was able to observe through the <u>dark tint</u> of the vehicle [window] what appeared to be a <u>temp tag</u> or a <u>dealer tag</u> that [he] <u>could not make out</u> . . . it was inside the window . . . the top left side."[9] (R. Vol. III at 7 (emphasis added).) Hernandez's unrefuted testimony was credible to the senses and satisfaction of the district judge. His reason for stopping the Yukon (lack of a <u>valid</u> plate or permit) did not dissipate just because he noticed what might be a permit, which he could not read, taped to the inside of a tinted window.

The majority concludes Hernandez's investigation should have terminated "when he saw that the vehicle actually had a plate—before he began questioning the vehicle's occupants." (Majority Op. at 14.) It reasons that because Hernandez incorrectly summarized the law regarding dealer plates in his testimony he had no reasonable suspicion the Yukon was not displaying a valid license plate when he saw "what appeared to be a temp tag or a dealer tag." (R. Vol. III at 7.) But that is not exactly what happened. First, the testimony[10]

---

[9] Compare *Edgerton* where the testimony was as follows:

"Q. And when were you first able to determine that it appeared to be a valid temporary tag in the back window of the vehicle?

A. As I approached the vehicle I could see it with my lights and my flashlight, I could see the tag."

*Edgerton*, 438 F.3d at 1045.

[10] The government's arguments are a different matter. *See infra* n.16.

- 7 -

discloses no reason to assume the vehicle was displaying a dealer <u>plate</u>; it was more likely a demonstration or temporary registration <u>permit</u> and Hernandez did not extend the traffic stop based upon a mistake of law.  Second, it makes no difference whether the observed "tag" was a permit or a plate; it was improperly displayed, permitting the officer to question the driver.  I will discuss my concerns in reverse order.

A.  <u>The Registration "Tag" Was Not Displayed as New Mexico Law Requires</u>[11]

In New Mexico, all vehicle permits or plates are required to be "clearly visible" or "visible or readable" regardless of whether they are demonstration permits, temporary registration permits, or dealer plates.[12]  *See* N.M. Stat. § 66-3-18(A) ("The registration <u>plate</u> [including a 'dealer plate'] shall be attached to the rear of the vehicle for which it is issued . . . securely fastened . . . not less than twelve inches from the ground . . . in a place and position so as to be clearly visible . . . and in a condition to be clearly legible.") and § 66-3-18 (B) ("A demonstration or temporary permit shall be firmly affixed to the left rear window

---

[11]  As did Officer Hernandez, I refer to the plate or permit (whichever it was) attached to the inside left rear window as a "tag."

[12]  The majority assumes the tag in the window was a dealer plate because the parties and the district court used that language.  The assumption is unwarranted if the totality of the transcript of the suppression hearing is considered, rather than isolated comments.  Hernandez stated he was unable to identify the permit.  Hernandez never testified he observed a "dealer plate" in the Yukon's rear window, rather he repeatedly referred to it as a "temp tag," a "dealer tag," or a "demonstration plate."  (*See*, *e.g.*, R. Vol. III at 7, 12.)  That confusion prompted extensive questions about dealer plates.  But, regardless of the tag's title, its display violated New Mexico law in that it was not clearly visible.

of the vehicle . . . unless [it] presents a safety hazard or . . . is not visible or readable from that position, in which case, [it] shall be displayed in such a matter that is clearly visible from the rear or left side of the vehicle.").

Here the "tag" was not clearly visible and certainly not legible or readable even at close range with the aid of a flashlight. This was a violation of New Mexico law. N.M. Stat. § 66-3-18(A), (B). Moreover, a displayed registration plate must also display a current validating sticker.[13] N.M. Stat. § 66-3-18(C). If the validating sticker was not visible and legible that requirement was not met.

Since Hernandez could not make out "what appeared to be a temp tag or a dealer tag" the tag was not displayed as the law required and he was justified in investigating further by questioning the driver. The reason for the stop – no valid license plate or permit – never dissipated in that Hernandez saw no evidence of a current, conforming tag of any sort.[14] But even if his discovery of some kind of

_____

[13] Defined to be: "the tab or sticker issued by the division to signify, upon a registration plate, renewed registration." N.M. Stat. § 66-1-4.19(A). "The department upon registering a vehicle shall issue a registration plate or a validating sticker to the owner of the vehicle. The validating sticker may be designed and required to be placed on the registration plate or elsewhere on the vehicle as prescribed by the department." N.M. Stat. § 66-3-14(A). "Succeeding registration renewals of the registration plate issued under Section 66-3-14 NMSA 1978 shall cause the division to issue a validating sticker only . . . ." N.M. Stat. 66-3-17(A).

[14] Even if that tag was a legitimate form of registration (a fact not supported by the record - the driver was cited for improper registration), Hernandez's testimony unquestionably states the tag was illegible. There is no evidence he was able to recognize the tag, read the tag, or ascertain if it was indeed valid. Restricting an officer from questioning a driver of a vehicle with no

(continued...)

plate or permit, valid or not, must end the inquiry as to whether the purpose of the stop has been satisfied (ignoring the requirements of the statutes that the plate or permit be visible and legible or readable), then the illegible or unreadable "tag" supplied a new and continuing "observed traffic violation or . . . reasonable articulable suspicion that [an actual] traffic or equipment violation has occurred or is occurring." *Botero-Ospina*, 71 F. 3d at 787, *to wit*, a violation of N.M. Stat. § 66-3-18. Either way Hernandez was justified in questioning the driver.

B.     The "Tag" in the Rear Window Was a Permit, Not a Plate, and Hernandez Did Not Err in His Original Assessment or in His Testimony

New Mexico has a host of vehicle registration plates[15] and permits. *See* N.M. Stat. § 66-3-6. Pertinent here is a dealer <u>plate</u>, which is "a unique plate

---

[14](...continued)
obvious form of current registration after seeing only an unidentifiable tag of some sort taped in the rear window is incomprehensible. In New Mexico

> Any peace officer may, upon discovering that the registration plate of any vehicle is illegible because of wear or damage or other cause, issue a citation to the owner or operator of the vehicle. The citation shall provide that the owner shall, within thirty days from the date of the citation, apply for and obtain a duplicate or replacement plate from the division.

N.M. Stat. § 66-3-17(C).

[15]  "[T]he department upon registering a vehicle shall issue a registration plate . . . [which] shall have a background of reflective material such that the registration number assigned to the vehicle is plainly legible from a distance of one hundred feet at night." N.M. Stat. § 66-3-14 (A), (B).

issued to the dealer . . . ."[16]  N.M. Stat. § 66-3-401(A).  It is "issued for a specific vehicle in the dealer's inventory."  *Id*.  A dealer vehicle so registered and properly displaying a dealer plate may be "operated or moved upon the highways for any purpose," *Id*., except for work or service vehicles defined as "parts or delivery vehicle[s], . . . vehicle[s] used to tow [other] vehicle[s], . . courtesy shuttle[s] or vehicle[s] loaned to customers . . ."  N.M. Stat. § 66-3-401(B).  Such plates are issued to a dealer in limited numbers.  N.M. Stat. § 66-3-402.

Temporary registration <u>permits</u> are also issued to dealers.  They are valid for thirty days and are issued to a person who purchases a vehicle from a dealer.  N.M. Stat. § 66-3-6(E).  And <u>demonstration permits</u> are issued to dealers.  They "shall be used to allow the operation of vehicles for the limited purposes of testing, demonstrating or preparing a vehicle for sale or lease.  [They] may not be used on work or service vehicles . . . that are owned, used or held in inventory by a dealer . . . .  [They] shall be valid for as long as the vehicle is held in the dealer's inventory."  N.M. Stat. § 66-3-6 (F).  They must name the dealer to whom the permit is issued and display a unique number assigned by the department.[17]  *Id.*

---

[16]  Presumably like the metal license plates, which adorn most cars.

[17]  Presumably they are cardboard or paper because "[t]he department may authorize in writing dealers  . . . to print and use at their own cost demonstration permits . . . ."  N.M. Stat. § 66-3-6(G).

Though the transcript of the suppression hearing suggests some ambiguity in terminology, Hernandez's testimony did not reveal an error of law regarding the "tag" he observed in the tinted window, but could not read. While permits and plates are different under New Mexico law, the attorneys seemed to conflate the terms. They referred to the "tag" in the window as a plate and the government cited the dealer plate statute (§ 66-3-401) in support of its arguments.[18] Hernandez may have been confused about the difference since he used the term "tag," but that is unlikely. The record pretty clearly establishes the paper tag taped to the rear window of the Yukon was either a temporary permit or a demonstration permit, not a metal dealer plate, which would be attached to the vehicle in the license bracket. Several things lead to that conclusion. Hernandez never referred to the "tag" as a plate (although he did not correct the attorneys when they asked him about the "plate"). Since there is no temporary plate available in New Mexico, Hernandez's reference to a "temp tag" or "dealer tag" most likely referred to a temporary permit or a demonstration permit. Temporary and demonstration permits are required to be "firmly affixed to the left rear window of the vehicle . . . unless [they] present[] a safety hazard or . . . [are] not visible or readable from that position, in which case [they] shall be displayed in such a matter that is clearly visible from the rear or left side of the vehicle."

---

[18] The government argued a possible misuse of a dealer <u>plate</u>, along with other factors, supplied reasonable suspicion for Hernandez to question the driver. It is now stuck with the detritus of its litigation strategy.

N.M. Stat. § 66-3-18(B). That is where the "tag" was located in the Yukon.

Plates, on the other hand, "shall be attached to the rear of the vehicle for which it

is issued." N.M. Stat. § 66-3-18(A).

Hernandez's testimony, reflecting his understanding of New Mexico law,

was entirely consistent with the statutory provisions relating to demonstration

permits.

Q.          . . . [W]ith regard to these dealer tags, do you have an
            understanding as to what the purpose of that tag is? And if so,
            can you describe it for me?

A.          The dealer tags are for auto dealerships, and based upon the
            operations of the auto dealership, their sole purpose is for
            demonstrating the vehicle or for sales of the vehicle. Usually,
            it's for test driving purposes or a demo vehicle.

(R. Vol. III at 7-8.) If, as a fair reading of the entire transcript suggests, he was

speaking of demonstration permits, not dealer plates, he was entirely correct.

Moreover, he did not testify that the use of demonstration permits was only

allowed during business hours. Rather he testified as to his understanding of how

the permits were generally used.

Q.      In your experience, do you typically—would you typically see that
        type of tag in use during the daytime?

A.      During the daytime, yes, as in from what you would call bank hours,
        eight to five. Usually not seen driven around for just[,] I guess[,]
        owner purposes.

(*Id.* at 8.) Any error of law on Hernandez's part derives from the contrived

notion that he was talking about dealer plates. And his opinion about the use of

demonstration permits, based upon experience and common sense, was legitimate. At most it was an error of fact, which as distinguished from a mistake of law, may support the probable cause or reasonable suspicion necessary to justify a traffic stop. *See United States v. Salinas-Cano*, 959 F.2d 861, 865-66 (10th Cir. 1992).